IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 06-00080 (03) SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING DEFENDANT KEVIN A. |
| vs. | ) | GONSALVES'S MOTION TO SUPPRESS |
| | ) | PHYSICAL EVIDENCE |
| KEVIN A. GONSALVES,  (03) | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT KEVIN A. GONSALVES'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE.

I.      INTRODUCTION.

        Defendant Kevin A. Gonsalves moves to suppress evidence obtained from the seizure, and resulting search, of a 1991 Ford Escort.  Gonsalves contends that (1) there was no probable cause to seize the Ford Escort; (2) a search occurred prior to the issuance of a search warrant; (3) the search warrant was not supported by probable cause and relied on material misstatements; and (4) the police unreasonably delayed obtaining a search warrant.  The Government claims that (1) the automobile exception applied and eliminated the need for a search warrant; (2) the seizure and subsequent search of the Ford Escort were supported by probable cause; (3) the alleged misstatements in the affidavit attached to the search warrant were immaterial; and (4) there is no requirement that a vehicle be searched contemporaneously with its lawful seizure.

The court concludes that probable cause supported the initial seizure of the Ford Escort, that the car was not thereafter searched without a warrant, and that the warrant subsequently obtained was supported by probable cause. Alternatively, the court concludes that, even if the search warrant was not supported by probable cause or was defective, the good-faith exception applies to justify reliance on the search warrant in searching the car after it had been towed to the police lot.  Gonsalves's motion to suppress is therefore denied.

II.      <u>FINDINGS OF FACT.</u>

1.   This court has before it three exhibits submitted by Gonsalves: (1) the search warrant issued by the state court on January 15, 2004 ("Ex. A"); (2) the affidavit of Honolulu Police Department ("HPD") Detective Kathleen Osmond in support of the warrant application ("Ex. B") made on January 15, 2004; and (3) the Return of the Search Warrant, dated April 13, 2004, ("Ex. C").  In addition, the court considers two exhibits submitted by the Government: (1) a transcript of a 911 call made by Richard Pang, the husband of Gonsalves's stepmother, on January 7, 2004 ("Ex. 1"); and (2) a synopsis of a 911 call made by John Ornelles of Hawaiian Memorial Park ("HMP"), a cemetery and mortuary on January 8, 2004 ("Ex. 2").

2.   This court held an evidentiary hearing, during which it received oral testimony from Ornelles, Pang, HPD

Detective William Lee, HPD Detective Kenneth Higa, HPD Detective Osmond, and Gonsalves.  This court found Osmond credible on the matters to which she testified.  Cross-examination of Ornelles and Pang revealed that both Ornelles and Pang were confused about some of the matters to which they testified, but they appeared to the court to be attempting to be truthful.  Based on the written and oral evidence, the court finds the following by a preponderance of the evidence:

3.  On the evening of January 6, 2004, Gonsalves met with his sister, Catherine Gutierrez, and asked for permission to borrow her car the following day.  Gonsalves testimony.[1]

4.  The next morning, on January 7, 2004, Gonsalves's nephew drove the car to where Gonsalves was and handed Gonsalves a single key.  Gonsalves then drove Gutierrez's car to HMP to attend a memorial service.  Gonsalves parked the car on a road on the cemetery grounds, got out, and locked the car.  He says that at some point during that day he lost the key.  He says he therefore asked his sister if she had another key she could use to pick up the car.  Id.

---

[1]In an effort to rule promptly on the merits and to avoid the burden on the court's overextended court reporters, the court did not request, and therefore does not have, final transcripts of the live testimony.  References to the testimony are based on the court's recollection and notes, and on the court reporter's "rough" version of the transcripts.  Accordingly, this court is unable to give exact page and line citations to the testimony.

5.   On the afternoon of January 7, 2004, three men were shot at the Pali Golf Course, which is near the cemetery. Two of the men died.  Motion at 2; Opp. at 3.  Detective Osmond was assigned to investigate the shootings.  Ex. B at 6.

6.   In the evening, HPD received a phone call from Pang, who said he was calling about the "golf course shooting." Ex. 1 at 1.  Pang was distraught, having just received a telephone call from Gutierrez informing him that Gonsalves had been one of the shooters and warning Pang that revenge might be sought against Gonsalves's relatives.  Id. at 3-4.  Pang told the HPD dispatcher that both Gutierrez and Gonsalves were armed.  Id. at 4.  Later that evening, Detective Osmond listened to the recording of Pang's 911 telephone call.  Osmond Testimony.

7.   That evening, Lepo Utu Taliese, one of the men shot, identified the shooters as Rodney Joseph and Malu Motta. Ex. B at 6-7.  Lepo Utu Taliese died later that evening.  Id.

8.   On the morning of January 8, 2004, Ornelles called the police station to request that a gray Ford Escort left overnight be towed, as it was blocking the driveway used for deliveries.  Ex. 2; Ornelles Testimony.  Ornelles told the police that the car might be related to the shootings, and that two of the men involved in the shootings had attended a funeral at HMP the previous day.  Ex. 2; Osmond Testimony.  There had been only

one memorial service at the cemetery the previous day.  Ornelles Testimony.

9.  Officer Lee, now Detective Lee, responded to Ornelles's call.  Officer Lee arrived at the cemetery a little before 11 a.m. and called Ornelles on his cell phone.  Lee Testimony; Ornelles Testimony.  Officer Lee did not meet Ornelles in person, but heard in the cell phone conversation that the people connected to the car might have been involved with the shootings.  Id.  Officer Lee relayed this information to Detective Osmond.  Officer Lee described the car as a gray 1991 Ford Escort with "PHENOM" stickers covering the windows ("Ford Escort").  Lee Testimony; Osmond Testimony.  Officer Lee told Detective Osmond that PHENOM was an organization that promoted kickboxing.  Ex. B at 10; Osmond Testimony.  Detective Osmond, who knew that Joseph was a kickboxer, told Officer Lee to remain with the car and to let her know if anyone tried to claim the car.  See Osmond Testimony; Lee Testimony.

10.  Detective Osmond then checked the police computer system for registration information for the Ford Escort and learned that there was a "transfer pending," which meant that the car had been sold but the new owner's paperwork for registering the car had not yet been processed.  See Osmond Testimony.  Detective Osmond learned that the previous owner was John Wilson

of Waianae, and she asked Detective Higa to find Wilson.  Id.;
Higa Testimony; Ex. B at 10.

11.  Detective Higa telephoned Wilson, who said that
he had recently sold the Ford Escort to a woman named "Cat."  See
Higa Testimony.  Detective Higa gave this information to
Detective Osmond.  Id.; Osmond Testimony.

12.  Detective Osmond told Officer Lee to have the
Ford Escort towed to a police lot.  A tow truck arrived at the
cemetery a little after one in the afternoon.  Lee Testimony;
Osmond Testimony.  Officer Lee followed the tow truck with the
Ford Escort to the police lot.  Lee Testimony.  As of the time
the Ford Escort was towed, HPD had not searched the car, and
nobody had claimed the car.  Id.; Osmond Testimony.  Thereafter,
the car was not searched until a search warrant was obtained.

13.  Later that evening, Detective Osmond interviewed
Nixon Maumalanga, who had driven the three victims and Gonsalves
to the Pali Golf Course.  Ex. B at 8.  Maumalanga and the three
victims were under the impression that Gonsalves had arranged a
business meeting with Motta and Joseph.  At the golf course, one
of the victims got out of the car he was in and was shot by the
passenger from the other car.  Id. at 8-9.

14.  That evening, Detective Osmond learned from
Joseph that he and Motta had attended a funeral on January 7,
2004, at HMP.  Id. at 8.  Joseph said that Gonsalves, one of

6

Joseph's friends, had also attended the funeral, although Joseph did not know how Gonsalves had gotten there.  Id. at 9.

15.  Meanwhile, Detective Higa was searching for Cat, the new owner of the Ford Escort.  Higa Testimony; Ex. B at 11. Wilson had informed Detective Higa that, although he did not know where Cat lived, he had seen her around his neighborhood.  Higa Testimony.  Detective Higa went to a house on Waianae Valley Road and spoke with Leimomi Auwae, Gutierrez's mother-in-law.  Ex. B at 11.  Auwae told Detective Higa that Gutierrez had recently purchased an older model used car.  Id.

16.  On January 15, 2004, Detective Osmond submitted an application for a search warrant to Judge Christopher P. McKenzie, a state judge of the District Court of the First Circuit of Hawaii.  Ex. A.  Judge McKenzie, finding probable cause, authorized the search of the Ford Escort with John M. Wilson as the last known registered owner.  Id. at 2.  The search warrant was executed that same day, and various items were recovered.  See Ex. C at 3-4.

17.  From the time Ornelles first made his call on January 8, 2004, to the execution of the search warrant, no individual contacted HPD to claim the Ford Escort.

III.        CONCLUSIONS OF LAW.

> A. Gonsalves has Standing to Challenge the Seizure
> and Search of the Ford Escort.

1. The Government challenges whether Gonsalves has standing to challenge the seizure and subsequent search of his sister's Ford Escort.  Specifically, the Government contends that Gonsalves abandoned any interest in the Ford Escort when he left the car at HMP overnight, and when he failed to claim the car in the week following the memorial service.

2. Standing is determined by examining whether the individual has a "legitimate expectation of privacy in the invaded space." Rakas v. Illinois, 439 U.S. 128, 143 (1978).  An ownership interest is not necessary to establish a legitimate expectation of privacy. United States v. Thomas, 447 F.3d 1191, 1198 (9th Cir. 2006).  The Ninth Circuit says that a defendant has standing to challenge the search of another's car when that defendant has permission from the owner to use the car, is in possession of the car, and holds a key to the car. United States v. Portillo, 633 F.2d 1313, 1317 (9th Cir. 1980); see also Thomas, 447 F.3d at 1199 (holding that a driver of a rental car driving with permission from the authorized driver, but without authorization from the rental company, has standing to challenge the search of the rental car).

3. When a person has abandoned property, he has no standing to challenge the search or seizure of the abandoned

property.  United States v. Jackson, 544 F.2d 407, 409 (9th Cir. 1976).  "Abandonment is a question of intent.  The inquiry should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure."  United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir. 1986).  This court looks at the totality of circumstances when determining abandonment.  Of particular significance is whether there has been "denial of ownership and physical relinquishment of the property."  Id.  The Government has the burden of establishing abandonment.  See United States v. Fernandez, 772 F.2d 495, 499 (9th Cir. 1985).

        4.  Gonsalves, although not the registered owner of the Ford Escort, had permission from Gutierrez to use the Ford Escort.  Gonsalves had a key for the car, and even though he had subsequently lost the key, was in possession of the car when he arrived at HMP, and locked the door when he got out.  These actions demonstrated Gonsalves's ability to "exclude all others, save his [sister], the owner."  Portillo, 633 F.2d at 1317.  Gonsalves, therefore, had a legitimate expectation of privacy in the Ford Escort.

        5.  The Government has failed to establish that Gonsalves abandoned the car.  After parking the car near HMP, Gonsalves got out and locked the car.  A little more than 24

hours later, HPD seized the car.  Gonsalves's failure to claim the car within this period is insufficient to establish abandonment.  In Nordling, the defendant was deemed to have abandoned a bag only after denying numerous times that he owned it and then leaving it behind on an airplane.  Nordling, 804 F.2d at 1470.  Gonsalves had no such denial of ownership, and the Government has not established that Gonsalves relinquished his car in failing to claim it in the 24 hours before it was seized. As the Government has failed to establish abandonment, Gonsalves has standing to challenge seizure and search of the Ford Escort.

B.  The Pre-Warrant Seizure of Car Was Supported by Probable Cause.

1.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." See United States v. Place, 462 U.S. 696, 701 (1983).  The Fourth Amendment generally requires police to secure a warrant before conducting a search, California v. Carney, 471 U.S. 386, 390-91 (1985), as searches conducted outside the judicial process, without prior approval by a judge, are per se unreasonable under the Fourth Amendment.  United States v. Ross, 456 U.S. 798, 825 (1982); Katz v. United States, 389 U.S. 347, 357 (1967).

2.  There are a few specifically established and well-delineated exceptions to this warrant requirement.  See United States v. Ross, 456 U.S. 798, 825 (1982); Katz v. United

10

States, 389 U.S. 347, 357 (1967).  A warrantless search of an automobile is one such exception.  If there is probable cause for believing that an automobile contains contraband, officers are entitled to search it.  Carroll v. United States, 267 U.S. 132, 153-54 (1925); see also Maryland v. Dyson, 527 U.S. 465, 467 (1999) (a finding of probable cause that a car contains contraband is sufficient to support a warrantless search, and there is no separate exigency requirement); United States v. Pinela-Hernandez, 262 F.3d 974, 978 (9th Cir. 2001) ("police may conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband").  A search is similarly permitted if there is probable cause to believe there is evidence of a crime in the automobile.  Ornelas v. United States, 517 U.S. 690, 696 (1996).

3.  The automobile exception is grounded in two basic principles: (1) the mobility of vehicles and (2) a reduced expectation of privacy given the pervasive regulations applicable to vehicles.  See Carney, 471 U.S. at 393; Pinela-Hernandez, 262 F.3d at 978 ("The reasons for this exception are twofold: the expectation of privacy in one's vehicle is less than in one's home, and the mobility of vehicles necessitates faster action on the part of law enforcement officials.").

4.  Because the Ford Escort was seized when it was towed, see United States v. Bagley, 772 F.2d 482, 490 (9th Cir.

11

1985), whether probable cause supported its subsequent search must be determined at the time of the seizure, rather than at the time of the search.  See United States v. Trejo-Zambrano, 582 F.2d 460, 463 (9th Cir. 1978) (determination of whether probable cause exists for a warrantless search is made at the time of the seizure, not at the time of the search); see also Chambers, 399 U.S. at 51-52 ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.") (emphasis added); United States v. Bagley, 772 F.2d at 490 (like searches, seizures of vehicles under the automobile exception require probable cause to believe that the vehicles contain contraband or evidence of a crime).

5.  Probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  Ornelas, 517 U.S. at 696.  In determining the existence of probable cause, this court examines the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983).

6.  In Bagley, the Ninth Circuit upheld a warrantless seizure of a car based on probable cause.  The police had towed a car to a police lot without a warrant and, three days later,

12

obtained a search warrant and searched the car.  Bagley, 772 F.2d at 486.  The court found that probable cause supported the warrantless seizure and subsequent search of the car under the automobile exception.  See id. at 491 ("We now hold that the existence of probable cause alone justifies a warrantless search or seizure of a vehicle lawfully parked in a public place.").  The Bagley court affirmed the district court's determination that probable cause had supported the seizure and subsequent search of the car based on an eyewitness identification of the car as the getaway car, and based on sunglasses and gloves similar to those worn by the robber being visible in the car.  Id.

        7.  Probable cause supported HPD's seizure of the Ford Escort.  Police were told that people involved with shootings the previous day had attended a funeral at HMP before the shootings.  There had only been one memorial service at HMP on January 7, 2007.  HPD knew the names of individuals allegedly involved, and they had also received a call from Pang, identifying Gonsalves as one of the shooters.  From the phone call, HPD learned that Gonsalves and his sister had gone into hiding.  HPD had also received a call from Ornelles, who requested that the Ford Escort be towed because it was blocking truck deliveries.  On the car's windows were stickers affiliated with kickboxing, and Detective Osmond knew that one of the alleged shooters was involved with kickboxing.  The police had also made efforts to contact the

owner of the car to discern whether the car had merely broken

down.  At the time of the seizure, nobody had called either HMP

or HPD to claim the car.  Someone might have removed the car from

HMP property before a warrant could have been obtained.  Given

the totality of the circumstances, probable cause supported the

warrantless seizure of the Ford Escort.

        C.   The Post-Warrant Search of Car Was Supported by
           Probable Cause.

      1.  Gonsalves contends that the Government

unreasonably delayed in seeking a warrant to search the Ford

Escort by waiting one week after its seizure before obtaining a

warrant.  This court is not persuaded by this argument because,

under the automobile exception to the warrant requirement, when

there is probable cause to seize a car, the police need not

obtain a search warrant to search it.

      2.  Once there is probable cause to seize a car, a

subsequent warrantless search of it is valid.  United States v.

Henderson, 241 F.3d 638, 649 (9th Cir. 2000); see also United

States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987) (holding

that once police have lawfully seized an item, a subsequent

search of that item can be conducted without a warrant).

      3.  "There is no requirement that the warrantless

search of a vehicle occur contemporaneously with its lawful

seizure."  United States v. Johns, 469 U.S. 478, 484 (1985).  The

Supreme Court has upheld searches that have occurred numerous

days after the initial seizure when there is "probable cause to believe that the [vehicle] contained contraband." Id. at 387. In Johns, the Supreme Court reversed a Ninth Circuit decision holding that a delay in searching packages located in a vehicle made the search of those packages unreasonable.  Id.  Because law enforcement officials could have lawfully searched the packages at the time they were seized from the vehicle, the Supreme Court concluded that a three-day delay was not unreasonable and did not violate the Fourth Amendment.  In Cooper v. California, 386 U.S. 58, 58, 61 (1967), the Supreme Court similarly held that a warrantless search of a vehicle one week after its initial seizure was not unreasonable.

        4.  Given this court's determination that the initial seizure of the Ford Escort was supported by probable cause, and given the Supreme Court's guidance in Johns and Cooper, the court concludes that waiting one week before obtaining the search warrant does not render HPD's search of the Ford Escort invalid.

        D.  Probable Cause Supported the Search Warrant.

        1.  Gonsalves also challenges the post-warrant search of the vehicle, arguing that the search warrant was not supported by probable cause because the information in its application "did not establish probable cause that the car or its'[sic] occupants were involved in the shooting, or that even if the occupants were involved in the shooting, it was reasonable to expect evidence

15

relating to the shooting would be found in the car."  Motion at 13.

2.  A judge's issuance of a search warrant is reviewed to determine whether "the magistrate had a substantial basis for concluding that probable cause existed.  In doubtful cases, preference should be given to the validity of the warrant." United States v. Schmidt, 947 F.2d 362, 371 (9th Cir. 1991) (internal quotation marks and citations omitted); accord United States v. Chavez-Miranda, 306 F.3d 973, 979 (9th Cir. 2002) ("We need only find that the issuing magistrate had a substantial basis for finding probable cause.").  Probable cause is determined by looking at the totality of the circumstances, and will be found when there is "a fair probability that contraband or evidence of the crime will be found."  United States v. Gil, 58 F.3d 1414, 1419 (9th Cir. 1995).

3.  Under this deferential standard, the court concludes that the state judge had a "substantial basis" for determining that evidence relating to the shootings would be found in the Ford Escort.  The application for the search warrant indicated that Gonsalves had been involved in the shooting, that Gonsalves had arrived at HMP by means of his own transportation but had left with Joseph, and that Gonsalves was currently in hiding.  See Ex. B at 11-12.  The car had been left overnight at HMP, and nobody had called to claim its possession. HPD had

reason to believe that Gonsalves's sister was the new owner of the Ford Escort.  Id. at 12.  Accordingly, this court concludes that there was a substantial basis for the state court judge to determine that probable cause supported the issuance of the search warrant for the Ford Escort.

      E.  Gonsalves's Challenge to the Truthfulness of the Affidavit Supporting the Search Warrant Application is Not Persuasive.

    1.  A criminal defendant has a right under the Fourth and Fourteenth Amendments, after ex parte issuance of a warrant, to challenge the truthfulness of statements made in affidavits supporting the warrant.  Franks v. Delaware, 438 U.S. 154, 171 (1978); United States v. Johns, 851 F.2d 1131, 1133 (9th Cir. 1988).  The defendant is entitled to make that challenge at an evidentiary hearing, or a Franks hearing, only if that defendant makes a suitable preliminary proffer of material falsity as to statements made in those affidavits:

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false;  and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.  The deliberate falsity or reckless disregard

17

whose impeachment is permitted today is only
that of the affiant, not of any
nongovernmental informant.  Finally, if these
requirements are met, and if, when material
that is the subject of the alleged falsity or
reckless disregard is set to one side, there
remains sufficient content in the warrant
affidavit to support a finding of probable
cause, no hearing is required.

Franks v. Delaware, 438 U.S. 154, 171 (1978).

2.  An affidavit submitted in support of an

application for a warrant is presumed valid.  Franks, 438 U.S. at

171.  It is subject to a Franks hearing only if the challenger

meets a five-part test: (1) the defendant must make specific

allegations that indicate the portions of the warrant claimed to

be false; (2) there must be a contention of deliberate falsehood

or reckless disregard for the truth; (3) the allegations must be

accompanied by a detailed offer of proof, preferably in the form

of affidavits; (4) the offer of proof must challenge the veracity

of the affiant, not that of his informant; and (5) the challenged

statements in the affidavit must be necessary to a finding of

probable cause.  United States v. Kiser, 716 F.2d 1268, 1271 (9th

Cir. 1983).  Clear proof of deliberate or reckless omission is

not required, but the defendant must make at least a "substantial

showing" that the affiant intentionally or recklessly omitted

facts required to prevent technically true statements in an

affidavit from being misleading.  United States v. Stanert, 762

F.2d 775, 781 (9th Cir. 1985); accord Chavez-Miranda, 306 F.3d at

18

979 ("The movant bears the burden of proof and must make a
substantial showing to support both elements.").   Moreover, a
defendant cannot make a "substantial showing" by arguing that the
affidavit did not contain every fact known to the affiant.
United States v. Ventresca, 380 U.S. 102, 108 (1965).   Instead,
affidavits must be examined in a commonsense and realistic
fashion.   Id.

          3.   Gonsalves contends that Detective Osmond's
Affidavit "contains material misstatements of fact, which if
omitted from the Attachment, cause the remainder of the
Attachment to be insufficient to establish probable cause."
Motion at 16.   Specifically, Gonsalves claims that there were two
material misstatements:   (1) the statement that the Ford Escort
was "next to" the funeral chapel when, in fact, it was located
"about 100 feet Northeast of the main chapel area" and (2) the
statement that Wilson told Detective Higa where Cat lived and
described her house to Detective Higa when, in fact, Wilson did
not know where Cat lived.   Id. at 17.   Neither claim requires
this court to hold a Franks hearing.

          4.   Even if the court assumes that Detective Osmond's
affidavits contained falsehoods, Gonsalves fails to show that any
such falsehood is material.   "In determining materiality, the
pivotal question is whether an affidavit containing the omitted
material would have provided a basis for a finding of probable

19

cause." <u>Chavez-Miranda</u>, 306 F.3d at 979 (internal quotation marks and citations omitted).   The alleged misstatements in Detective Osmond's affidavit were minor discrepancies that would not have affected the state-court judge's determination of probable cause.   Even if the Ford Escort had not been parked "next to the chapel," there would still have been a fair probability that the driver who had parked the vehicle near HMP had attended a service there.   Also, the location of Gutierrez's residence had already been established by Pang's telephone call, and it was not necessary to rely on a statement by Wilson.

> F.   The Good-Faith Exception Also Supports the Search of the 1991 Gray Ford Escort.

1.   Even if the warrant authorizing the search of the 1991 gray Ford Escort was not supported by probable cause or the warrant contained material misstatements, the search of the 1991 gray Ford Escort was sustainable under the good-faith exception set forth in <u>United States v. Leon</u>, 468 U.S. 897 (1984). "[P]hysical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate leads to the conclusion that such evidence should be admissible in the prosecution's case in chief."   <u>Id.</u> at 912; <u>see also</u> <u>United States v. Hendricks</u>, 743 F.2d 653, 656 (9th Cir. 1984) (holding that "evidence should not be suppressed if the officers' reliance on the warrant was reasonable").

2.  HPD searched the Ford Escort, only after obtaining a search warrant issued by a state court judge.   No evidence was submitted to this court that suggests that HPD had any reason to doubt the validity of the warrant for the vehicle.  "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."  Leon, 468 U.S. at 920.  Even if the search warrant was deficient in some respect, HPD relied on the warrant in good faith, and its search of the Ford Escort pursuant to a search warrant falls under Leon's good-faith exception.

IV.      CONCLUSION.

For the foregoing reasons, Gonsalves's motion to suppress is denied.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 15, 2008.




_/s/ Susan Oki Mollway_
Susan Oki Mollway
United States District Judge


**United States v. Kevin A. Gonsalves**; CR. No. 06-00080 (03) SOM; ORDER DENYING DEFENDANT KEVIN A. GONSALVES'S MOTION TO SUPPRESS PHYSICAL EVIDENCE.